**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| AMARION HARRIS,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC.,<br><br>Defendant. | **Civil Case No.:** 2:26-cv-01836<br><br>**JURY TRIAL DEMNADED** |

# COMPLAINT

Amarion Harris ("Plaintiff" or "Mr. Harris") brings this action on an individual basis, against Equifax Information Services, LLC ("Defendant" or "Equifax") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq*., arising out of Defendant's mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. Defendant Equifax Information Services LLC ("Equifax"), together with non-parties, Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC ("Trans Union"), are the three major credit reporting bureaus in the United States.

5. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8. Congress made the following findings when it enacted the FCRA in 1970:

> (a) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

9. Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

10. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

11. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

12. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

13. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

14. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

15. Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

16. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

**PARTIES**

17. Amarion Harris ("Plaintiff" or "Mr. Harris") is a natural person residing in Milwaukee, Wisconsin, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18. Defendant Equifax Information Services, LLC. ("Defendant" or "Equifax") is a corporation with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309, and is authorized to do business in the State of Wisconsin, including within this District.

19. Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f) and each Defendant is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

**JURISDICTION AND VENUE**

20. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTS**

**Summary of the Fair Credit Reporting Act**

22. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to

fairness and accuracy in the reporting of their credit information.

23. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

24. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

25. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

26. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The "Mixed File" Problem**

27. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

28. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

29. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

30. "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

31. Defendant's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

32. Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other. This violates the consumer's privacy and also greatly increases their risk of identity theft.

**The "Mixed File" Problem is Known to Defendant**

33. Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files.

34. In particular, Defendant has been on notice of the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

35. Defendant mixes files even though every consumer has unique personal identifying information, such as a Social Security number. That is so because their systems allow information to be included in a consumer's file even when the Social Security number reported with the information is different from the Social Security number on the consumer's file.

36. Defendant knows that its matching procedures are causing inaccurate consumer reports, consumer disclosures, and mixed files.

37. In the 1990's, the Federal Trade Commission ("FTC") sued Defendant (together with non-parties Experian and Trans Union) because of its failure to comply with the FCRA including the mixing of consumers' files.

38. In the 1990s, the Attorneys General of numerous states sued Defendant (together with non-parties Experian and Trans Union) because of its failure to comply with the FCRA including the mixing of consumers' files.

39. In 1991, TRW (Experian's predecessor) signed a Consent Order with the FTC. To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and social security number.

40. In 1992, non-party Trans Union signed a Consent Order with the Attorneys General of 17 states. Non-Party Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make

any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

41. In 1992, Defendant signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

42. In 1995, Defendant signed a Consent Order with the FTC. Defendant agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

43. To prevent the occurrence of a mixed file, Defendant together with non-parties Experian and Trans Union entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

44. Defendant and non-parties Experian and Trans Union continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

45. When those lawsuits have gone to trial, juries have found that Defendant and non-parties Experian and Trans Union, willfully violated the accuracy and reinvestigation requirements

of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million. Yet the "mixed file" problem continues.

46. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant and non-parties Experian and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

47. Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers matched. *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

48. In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

49. In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

[1] *A.G. Schneiderman Announces Groundbreaking Consumer Protection Settlement With The Three National Credit Reporting Agencies*, Office of the N.Y. State Att'y Gen., (Mar. 9, 2015) https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three (last visited Apr. 14, 2026).

50. In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

51. More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom*. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

52. Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA.

53. FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

54. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco*

*Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

55. No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

56. Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

57. Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

58. Despite knowing the breadth and severity and even the consequences of the mixed file problem, Defendant does not maintain policies and procedures to ensure compliance with its duties under the FCRA.

59. Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in consumer reports about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of Plaintiff's twin sister.

**Plaintiff's Lawsuit Against Equifax in 2024**

60. In 2024, Plaintiff filed a lawsuit against Defendant for failing to assure maximum possible accuracy concerning the information contained in his consumer reports in relation to previously mixing Plaintiff's file with that of his twin sister. *See*, *Amarion Harris v. Equifax Information Services, LLC et al*, Case No. 2:23-cv-01673-PP filed in the Eastern District of Wisconsin.

61. On or about September 12, 2024, the matter was resolved and Equifax corrected its

reporting by removing the information belonging to his twin sister.

62. At that point, Plaintiff reasonably believed the mixed reporting had been permanently corrected and that he would no longer have to worry about inaccurate information appearing on his consumer reports.

**Plaintiff Applies for Mortgage Pre-Approval with Associated Bank**

63. At least as of October/November 2024, believing the mixed file issue behind him, Plaintiff started thinking about buying a home.

64. Specifically, Plaintiff was looking into buying a home because he desired more space for his son (at the time, ate two).

65. On or about November 4, 2024, Plaintiff completed and submitted a mortgage pre-approval application through Associated Bank.

66. For Associated Bank to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit files. Plaintiff provided Associated Bank with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

**Associated Bank Decisions Plaintiff's Mortgage Application**

67. On or about November 4, 2024, Associated Bank ordered a merged credit report about Plaintiff from Factual Data.

68. Upon information and belief, Factual Data then ordered a consumer report about Plaintiff from the three major CRAs, Defendant and non-parties Experian and Trans Union.

69. On or about November 4, 2024, Associated Bank received and reviewed Equifax's credit report about Plaintiff.

70. Upon information and belief, Equifax's credit report about Plaintiff included inaccurate information that did not belong to him.

71. Upon information and belief, Equifax's credit report about Plaintiff included a Sunrise Banks c/o Self Financial Inc. Account, ending in 4278, ("the Account") belonging to Plaintiff's twin sister.

72. Upon information and belief, the Account negatively impacted Plaintiff's debt-to-income ("DTI") ratio.

73. Upon information and belief, the inaccurate information on Plaintiff's credit report negatively impacted the terms that Plaintiff was pre-approved for.

74. Upon information and belief, Defendant mixed Plaintiff's consumer file with that of his twin sister.

75. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies for a Mortgage Through Novus Home Mortgage**

76. Hoping to find a mortgage lender that would approve him on more favorable terms, Plaintiff looked for other lenders to apply with.

77. On or about November 12, 2024, Plaintiff completed and submitted a mortgage application through Novus Home Mortgage ("Novus"), a mortgage broker.

78. For Novus and any lender to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit files. Plaintiff provided Novus with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

**Defendant Publishes Inaccurate Information to Novus/Informative Research**

79. On or about November 12, 2024, Novus ordered a merged credit report on Plaintiff from Informative Research.

80. Upon information and belief, Informative Research then ordered a consumer report about Plaintiff from the three major CRAs, Defendant and non-parties Experian and Trans Union.

81. On or about November 12, 2024, Novus received and reviewed Equifax's consumer report about Plaintiff.

82. Upon information and belief, Equifax's credit report about Plaintiff included inaccurate information that did not belong to him.

83. Upon information and belief, Equifax's credit report about Plaintiff included the Account belonging to Plaintiff's twin sister.

84. Upon information and belief, the Account negatively impacted Plaintiff's DTI ratio.

85. Upon information and belief, the inaccurate information on Plaintiff's credit report negatively impacted the terms that Plaintiff was pre-approved for.

86. Upon information and belief, Defendant mixed Plaintiff's consumer file with that of his twin sister.

87. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

88. Ultimately, and no thanks to Defendant, Plaintiff secured a mortgage with JPMorgan Chase Bank.

**Plaintiff's Mixed Credit File**

89. Shocked, worried, confused, and hoping the mixed file issue had not returned, Plaintiff requested a copy of his consumer report from Defendant.

90. On or about April 11, 2025, Plaintiff was able to secure a copy of his credit file from Equifax.

91. Upon reviewing the contents of his Equifax credit file, Plaintiff was shocked at the appearance of a credit account that did not belong to Plaintiff at all.

92. Specifically, Defendant was reporting the following Sunrise Banks account which did not belong to Plaintiff:

(a) SUNRISE BANKS C/O SELF FINANCIAL INC
Account Number: XXXXXXXXXXXXXXXX4278
Date Opened: July 07, 2024
Status: PAYS_AS_AGREED
Balance: $665

93. The aforementioned account belongs to Plaintiff's twin sister.

94. By reporting the aforementioned credit account in the credit files presumably about Plaintiff, despite the fact that the account and information did not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's September 2025 Dispute to Equifax**

95. On or about May 17, 2025, still worried that something was very wrong with his credit file, Plaintiff disputed the inaccuracies with Equifax via certified mail. Specifically, Plaintiff disputed the Sunrise Banks account belonging to his twin sister.

96. However, the letter appeared to have gotten lost in the mail.

97. On or about September 6, 2025, Plaintiff mailed a second dispute to Equifax via certified mail. Specifically, Plaintiff disputed the Sunrise Banks account belonging to his twin sister.

98. Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his report.

99. According to the USPS tracking information Plaintiff's dispute letter was delivered to Equifax on September 12, 2025.

100. On or before, September 20, 2025, Equifax updated Plaintiff's report to remove the inaccurate Sunrise Banks account belonging to his twin sister.

101. At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of its agency or employment, and under the direct supervision and control of the Defendants herein.

102. At all times pertinent hereto, Defendant's' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

103. Defendant is aware of the shortcomings of its procedures and intentionally chose not to comply with the FCRA to lower its costs. Accordingly, Defendant's' violations of the FCRA are willful.

104. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental

and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

105. Moreover, Defendant's inaccurate reporting made Plaintiff fear that he would not be able to close on the home he had chosen to move into and put an offer on.

106. Plaintiff desired moving out of his apartment and into a home so that he could provide for his family and have a yard for his son. Plaintiff's son is now four years old.

107. Plaintiff wants to be a positive figure in his son's life and provide a safe living environment.

108. At the time, Plaintiff and the mother of his child were also working on their relationship. The inaccurate reporting returning again caused Plaintiff significant stress, frustration, and anxiety, which ultimately impacted his relationship with the mother of his child.

109. The inaccurate reporting is constantly on Plaintiff's mind. He often wonders whether the inaccurate reporting will ever stop or whether he will be dealing with the mix for the rest of his life.

110. Plaintiff also fears that he will be unable to obtain the credit he needs should he need to pay for medical care for his son/himself, obtain an auto loan, etc.

111. Due to the inaccurate reporting, Plaintiff is often distracted and suffers from sleepless nights. Plaintiff began taking an over-the-counter medication to help with the physical manifestations he suffered. Plaintiff also suffers from a racing heart and thoughts.

112. The inaccurate reporting has also caused tension between Plaintiff and his twin sister, the individual he has been mixed with at least twice at the hands of Equifax.

## CLAIMS FOR RELIEF

### COUNT I

### 15 U.S.C. § 1681e(b)

### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

### (Claim for Relief Against Defendant)

113. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

114. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

115. On at least three occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

116. Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

117. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

118. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental

and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

119. Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

120. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendants negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this October 5, 2026.


By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No. 036711
**Consumer Justice Law Firm PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (480) 613-7733
Email: mczabaj@consumerjustice.com

*Attorneys for Plaintiff Amarion Harris*